**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEB 7 - 2008
Feb 7 2008
Judge Robert W. Gettleman
United S       Court

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 07 CR 869 |
| vs. | ) Hon. Robert W. Gettleman |
| | ) |
| SOUTH SHORE SUPERMARKET, INC. | ) |

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant SOUTH SHORE SUPERMARKET, INC., and its attorney, LINDA BABICH, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

2. This Plea Agreement has been submitted to the officers of defendant, SOUTH SHORE SUPERMARKET, INC., which has manifested its intention and agreement by corporate resolution, properly executed, to plead the corporation guilty in accord with this agreement and has directed its Vice President, Secretary and co-owner, ABRAHAM SULIMAN, and its attorney, LINDA BABICH, to enter the plea agreement for defendant, in accord with Fed. R. Crim. P. 43(c)(1). A copy of this corporate resolution shall be made part of the record of this case at the time of the entry of the plea of guilty.

### Charges in This Case

3. The information in this case charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343 (Counts 1-6).

4. Defendant, through its representative, has read the charges against it contained in the information, and those charges have been fully explained to it by its attorney.

5. Defendant fully understands the nature and elements of the crimes with which it has been charged.

## Charge to Which Defendant is Pleading Guilty

6. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to Count Five of the information. Count Five charges defendant with wire fraud, in violation of Title 18, United States Code, Section 1343. In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

## Factual Basis

7. Defendant will plead guilty because it is in fact guilty of the charge contained in Count Five of the information. In pleading guilty, defendant admits the following facts and that those facts establish its guilt and relevant conduct beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

Beginning no later than on or about March 1, 2002, and continuing until on or about October 4, 2002, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant SOUTH SHORE SUPERMARKET, INC. ("SOUTH SHORE"), together with others known and unknown, knowingly devised, intended to devise and participated in a scheme to defraud and to obtain money and property from the United States Department of Agriculture ("USDA") by means of materially false and fraudulent pretenses, representations, and promises, resulting in the fraudulent processing and purchase of USDA food stamp program benefits in exchange for cash.

More specifically, beginning with its inception in 1994 and continuing through October 2002, Individual A was an owner of defendant SOUTH SHORE and held the position of corporate president. During the same period, Individual B was the manager of SOUTH SHORE and, in that

capacity, had primary on-site responsibility for the day to day operations of defendant SOUTH SHORE. At various times, including the period of March through October 2002, Individual B also was an officer of defendant SOUTH SHORE, holding, among other positions, the position of corporate secretary, and further held an ownership interest in defendant SOUTH SHORE. Defendant SOUTH SHORE was incorporated and registered to do business in the State of Illinois as a family-owned neighborhood supermarket located at 1856 East 79th Street, Chicago, Illinois, engaged in the retail sales of, among other things, specialty meat products and produce.

Beginning in July 1994 and continuing into October 2002, defendant SOUTH SHORE, through its co-owners and managers, including Individuals A and B, was an authorized participating retailer in the USDA food stamp program ("FSP"). As part of the initial USDA retailer authorization process, on or about May 18, 1994, Individual A designated Individual B, as the representative of SOUTH SHORE for purposes of defendant SOUTH SHORE's participation in the FSP. On or about May 18, 1994, Individual B, in his capacity as store manager and the designated representative of SOUTH SHORE, attended a FSP retailer training orientation held by the USDA Food and Nutrition Service ("FNS") during which INDIVIDUAL B was (1) instructed in and acknowledged understanding the Food Stamp Program rules and regulations including the prohibition against exchanging cash for food stamp benefits by participating retailers and their agents and employees, which conduct was illegal and could result in permanent disqualification from the FSP, as well as possible criminal prosecution; and (2) that was defendant SOUTH SHORE's responsibility, through Individual B, to ensure that all full-time and part-time employees were properly instructed regarding the FSP regulations. As further part of the same application process, on or about May 25, 1994, Individual B met with a representative of the FNS during a visit of the premises of SOUTH SHORE.

In the meeting, the FNS representative instructed Individual B further on FSP regulations, including, among others, the ban on trafficking food stamp benefits for cash and selling ineligible items for food stamp benefits, as well as the possible penalties for violating those regulations, including administrative and civil sanctions, as well as possible criminal prosecution, which Individual B understood and accepted as a condition of SOUTH SHORE's participation in the FSP. As further part of the application process, on or about May 26, 1994, Individual A, on behalf of defendant SOUTH SHORE, prepared and caused to be prepared and formally submitted to the USDA, a FSP Application for Stores. On the application, Individual A represented and caused to be represented to USDA, among other things, that: (1) SOUTH SHORE was a privately-owned company owned by Individual A; (2) Individual A was president of SOUTH SHORE; (3) Individual B was the on-site manager of SOUTH SHORE with primary responsibility for its day to day operations; (4) the estimated annual gross sales at SOUTH SHORE were $360,000, which included estimated annual FSP "eligible food sales" of approximately $280,000; and (5) SOUTH SHORE held a bank account at Marquette National Bank, located in Chicago, Illinois which it designated to receive food stamp redemptions. On the basis of the foregoing, on or about July 7, 1994, SOUTH SHORE was authorized to accept USDA food stamp benefits and received a USDA-FNS authorization number.

Defendant SOUTH SHORE was reauthorized as a participating retailer in the FSP through its submission of a series of three written reauthorzation applications which Individual A prepared and caused to be prepared and submitted and caused to be submitted to USDA on or about July 29, 1997, May 10, 1998 and December 20, 1999, respectively. On each of the reauthorization applications, Individual A represented and caused to be represented, among other things, that (1) Individual B was the on-site manager of SOUTH SHORE with primary responsibility for its day to

day operations; (2) SOUTH SHORE maintained and designated an account at Marquette National Bank in Chicago for the purpose of receiving food stamp program redemptions, and (3) that it would abide by all FSP rules and regulations, which SOUTH SHORE, through Individuals A and B, understood and knew included a prohibition both individually and by and through any of its agents or employees, against the trading FSP benefits, including, specifically, Link card benefits, in exchange for cash. SOUTH SHORE, through and by Individual A, further represented and caused to be represented that SOUTH SHORE's annual program eligible food sales were approximately $619,687 in the 1997 application, approximately $757,375 in the 1998 application and approximately $909,443 in the 1999 application. On the basis of these and other representations made in the context of the successive reauthorizations, USDA authorized SOUTH SHORE to continue to operate as a participating retailer in the food stamp program and assigned to it a Link card point of sale terminal known as a Link card machine with which to process eligible food stamp or Link card benefit transactions.

From on or about May 17, 1994 and continuing through at least in or about October 2002, defendant SOUTH SHORE maintained a bank account, numbered XX810, at Marquette National Bank in Chicago, Illinois, through which it received electronic transfers of reimbursements for food stamp and Link card benefit redemptions. Individuals A and B were the only authorized signatories on the account.

Beginning no later than on or about March 1, 2002, and continuing until on or about October 4, 2002, at Chicago, defendant SOUTH SHORE, acting through Individuals A and B, used and caused the use of defendant SOUTH SHORE's authorized program Link card machine by employees of defendant SOUTH SHORE to process fraudulent Link card transactions in which defendant

5

SOUTH SHORE caused the exchange of Link card benefits for discounted amounts of cash, knowing that such exchanges were prohibited under the FSP and its governing statutes and regulations. As a result of the foregoing, defendant SOUTH SHORE fraudulently caused the electronic transfer Marquette National Bank account # XX810 of approximately in $726,672 in Link card benefits during a period in which defendant SOUTH SHORE's eligible food sales were approximately $530,509, thereby causing a loss to the USDA of at least $196,163.

As part of and in furtherance of the scheme, a SOUTH SHORE employee used SOUTH SHORE's authorized Link card machine to process the following Link card transactions in return for discounted amounts of cash as follows: (i) a March 22, 2002, Link card debit transaction of approximately $60.59 in FSP benefits from a beneficiary account in return for approximately $40.00 in U.S. currency; (ii) an April 3, 2002, Link card debit transaction of approximately $35.11 in FSP benefits from a beneficiary account in return for approximately $25.00 in U.S. currency; (iii) an August 24, 2002, Link card debit transaction of approximately $603.36, through two debit transactions in the amounts of $312.37 and $290.99, in FSP benefits from a beneficiary account in return for approximately $300.00 in U.S. currency; (iv) a September 25, 2002, Link card debit transaction of approximately $340.50 in FSP benefits from a beneficiary account in return for approximately $23.00 in U.S. currency; (v) a September 25, 2002, Link card debit transaction of approximately $251.90 in FSP benefits from a beneficiary account in return for approximately $140.00 in U.S. currency; (vi) an October 1, 2002, Link card debit transaction of approximately $240.95 in FSP benefits from a beneficiary account in return for approximately $160.00 in U.S. currency; (vii) an October 1, 2002, Link card debit transaction of approximately $382.90 in FSP benefits from a beneficiary account in return for approximately $240.00 in U.S. currency; (viii) an

October 2, 2002, Link card debit transaction of approximately $496.03 in FSP benefits from a beneficiary account in return for U.S. currency; (ix) an October 2, 2002, Link card debit transaction of approximately $458.33 in FSP benefits from a beneficiary account in return for U.S. currency.

Additionally, SOUTH SHORE, through its managers and employees, including Individuals A and B, caused Affiliated Computer Services and its affiliates to make interstate wire transfers of funds constituting reimbursements for fraudulently redeemed Link card benefits to Marquette National Bank account # XX810 in Chicago, Illinois, through wire communications that originated from Austin, Texas. The wire transfers included, among others: (i) an electronic transfer on or about October 4, 2002 of funds in the amount of $16,868.09 and (ii) an electronic transfer on or about October 4, 2002 of funds in the amount of $2,315.66

In specific execution of the scheme, on or about October 4, 2002, at Chicago, in the Northern District of Illinois, defendant SOUTH SHORE, through Individuals A and B, knowingly caused to be transmitted by means of a wire communication in interstate commerce from Chicago, Illinois, to Austin, Texas, certain signals and sounds, namely: an electronic transfer of funds in the amount of approximately $16,868.09 to Marquette national Bank number XX810 held in the name of defendant SOUTH SHORE SUPERMARKET, in violation of Title 18, United States Code, Sections 1343 and 2.

## **Maximum Statutory Penalties**

8.     Defendant understands that the charge to which it is pleading guilty carries the following statutory penalties:

     a.    A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $250,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.

     b.    Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

     c.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $400 on the charge to which it has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

9.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

     a.    **Applicable Guidelines.** The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2007 Guidelines Manual.

     b.    **Offense Level Calculations.**

          i.    The base offense level for the charge in Count Five of the information is 7 pursuant to Guideline §2B1.1(a)(1);

        ii.       The offense level is increased by 10 levels pursuant to Guideline § 2B1.1(b)(1)(F) because the loss amount, represented by the value of the benefits diverted to unlawful uses is approximately $196,163.

        iii.       The base fine level for this offense is $250,000 pursuant to Guidelines Section 8C2.4(d) Offense Level Fine Table for an offense level of 17 (as referenced by Guidelines Section 8C2.4(a)).

        iv.       The culpability score is 4 points, based on a base level of five points under Guidelines Section 8C2.5(a), less one point for clearly demonstrated recognition and affirmative acceptance of responsibility under Guidelines Section 8C2.5(g)(3).

        v.       Based on the defendant's culpability score of 4 points as calculated in subparagraph 10(b)(iv) above, the minimum multiplier is 0.80 and the maximum multiplier is 1.60, pursuant to Guidelines Section 8C2.6.

        c.       **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

        d.       **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 17, which, when combined with the anticipated criminal history category of I and a culpability score of 4, results in an anticipated advisory Sentencing Guidelines organization base fine amount of $250,000, in addition to any term of probation and restitution the Court may impose.

        e.       Defendant and its attorney and the government acknowledge that the above Guideline calculations are preliminary in nature and based on facts known to the parties as of the

time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw its plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, certain components of those calculations – specifically, those set forth above in subparagraphs (a) through (d) of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

g. Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw its plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

time of this Plea Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw its plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that while none of the Guideline calculations set forth above are binding on the Court or the Probation Office, certain components of those calculations – specifically, those set forth above in subparagraphs (a) through (d) of this paragraph – are binding on the parties, and it shall be a breach of this Plea Agreement for either party to present or advocate a position inconsistent with the agreed calculations set forth in the identified subparagraphs.

g. Defendant understands that with the exception of the Guideline provisions identified above as binding on the parties, the Guideline calculations set forth above are non-binding predictions, upon which neither party is entitled to rely, and are not governed by Fed.R.Crim.P. 11(c)(1)(B). Errors in applying or interpreting any of the Sentencing Guidelines (other than those identified above as binding) may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw its plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

**Agreements Relating to Sentencing**

11. The government agrees to recommend that sentence be imposed at the low end of the applicable guidelines range.

12. It is understood by the parties that the sentencing judge is neither a party to nor bound by this Plea Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw its guilty plea.

13. Regarding restitution, the parties acknowledge that the total amount of restitution owed to the United States is $196,163, minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, § 3663A, the Court must order defendant to make full restitution in the amount outstanding at the time of sentencing. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing.

14. Defendant agrees to pay the special assessment of $400 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

15. After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the information as to this defendant.

**Forfeiture**

16. The information charges that defendant is liable to the United States for approximately $196,163, which funds are subject to forfeiture pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C) because those funds constitute proceeds of the violations alleged in Count One through Six. Further, defendant has

subjected real and personal property to forfeiture, namely, $196,163, including but not limited to (i) Funds in the amount of $45,228.05 in Marquette National Bank, Chicago, account XX810 held in the name of South Shore Supermarket, Inc., and (ii) $1,965 in currency seized from South Shore Supermarket on October 2, 2002, because that property constitutes proceeds of the wire fraud violation alleged in Count Five of the information. By entry of a guilty plea to Count Five of the information, defendant acknowledges that the property identified above is subject to forfeiture.

17. Defendant agrees to the entry of a forfeiture judgment in the amount of $47,193.05, including, specifically, (i) Funds in the amount of $45,228.05 in Marquette National Bank, Chicago, account XX810 held in the name of South Shore Supermarket, Inc. And (ii) $1,965 in currency seized from South Shore Supermarket on October 2, 2002, in that this property is subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership he has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law. Defendant is unaware of any third party who has an ownership interest in, or claim to, the property subject to forfeiture and will cooperate with the United States during the ancillary stages of any forfeiture proceedings to defeat the claim of a third-party in the event a third party files a claim. Defendant is aware that third parties may have claims to the property subject to forfeiture, but defendant's interest in the property exists because is the owner, holder and controlling party of the aforementioned funds.

18. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

## Presentence Investigation Report/Post-Sentence Supervision

19.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against it, and related matters. The government will make known all matters in aggravation and mitigation relevant to the issue of sentencing.

20.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of its financial circumstances, including its recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline §3E1.1 and enhancement of its sentence for obstruction of justice under Guideline §3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

21.     For the purpose of monitoring defendant's compliance with its obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient

evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

22. This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 07 CR 869.

23. This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24. Defendant understands that by pleading guilty it surrenders certain rights, including the following:

    a. **Right to be charged by indictment.** Defendant understands that it has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives its right to be prosecuted by indictment and

14

to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that it has been prosecuted by way of information.

      **b.**      **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against it, and if it does, it would have the right to a public and speedy trial.

          i.      The trial could be either a jury trial or a trial by the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

          ii.      If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and its attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

          iii.      If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict it unless, after hearing all the evidence, it was persuaded of its guilt beyond a reasonable doubt and that it was to consider each count of the information separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

          iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether

or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in its own behalf. If the witnesses for defendant would not appear voluntarily, it could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii.  At a trial, defendant would have a privilege against self-incrimination so that it could decline to testify, and no inference of guilt could be drawn from its refusal to testify. If defendant desired to do so, it could testify in its own behalf.

    c.  **Waiver of appellate and collateral rights.** Defendant further understands it is waiving all appellate issues that might have been available if it had exercised its right to trial. Defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal its conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal its conviction and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution or forfeiture, in exchange for the concessions made by the United States in this Plea Agreement. In addition, defendant also waives its right to challenge its conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28,

United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

    d.  Defendant understands that by pleading guilty it is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to it, and the consequences of its waiver of those rights. Defendant understands that it has the right to have the criminal charges in the information brought within five years of the last of the alleged acts constituting the specified violations. By signing this document, defendant knowingly waives any right to have the charges in the information brought against it within the period established by the statute of limitations. Defendant also knowingly waives any defense or claim based upon the statute of limitations or upon the timeliness with which the charges in the information were brought.

### Other Terms

25.  Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

26.  Defendant further understands and agrees that it is material to this plea agreement that Individual A and Individual B enter into a written agreement with the United States Department of Agriculture providing for the lifetime debarment of Individual A and Individual B, each individually and through or by any corporate form or relationship, from participation in any manner in the USDA food stamp program.

## Conclusion

27. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

28. Defendant understands that its compliance with each part of this Plea Agreement extends throughout the period of its sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event it violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29. Should the judge refuse to accept defendant's plea of guilty, this Plea Agreement shall become null and void and neither party will be bound thereto.

30. Defendant and its attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

31. Defendant acknowledges that it has read this Plea Agreement and carefully reviewed each provision with its attorney. Defendant further acknowledges that it understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 2/7/08

PATRICK J. FITZGERALD
United States Attorney

SOUTH SHORE SUPERMARKET, INC.
Defendant, by its corporate Secretary
and designated representative,
ABRAHAM SULIMAN

JOSEPH FERGUSON
Assistant U.S. Attorney

LINDA BABICH
Attorney for Defendant